IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| UGUNDI JACOBS, | § | |
| | § | No. 351, 2025 |
| Defendant Below, | § | |
| Appellant, | § | Court Below–Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 2407000006 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: January 6, 2026
Decided: March 23, 2026

Before **VALIHURA**, **TRAYNOR**, and **LEGROW**, Justices.

## <u>ORDER</u>

After consideration of the no-merit brief and motion to withdraw filed by the appellant's counsel under Supreme Court Rule 26(c), the State of Delaware's response, and the Superior Court record, it appears to the Court that:

(1) In September 2024, a Superior Court grand jury indicted the appellant, Ugundi Jacobs, for strangulation, second degree unlawful imprisonment, malicious interference with emergency communications, and two counts of offensive touching.

(2) Jacobs was tried before a jury in April 2025. Five witnesses testified for the State. Corporal Zonyiho Dongbetor, a patrol officer for the Wilmington Police Department, testified that he was dispatched to the Luxor Apartment Complex at roughly 10:25 p.m. on June 30, 2024, in response to a 911 call reporting that a

domestic incident was in progress. Corporal Dongbetor was unable to advance beyond the lobby of the apartment building until a man, later identified as Jacobs, admitted him into the restricted-access building and led him to Waynna Dobson's third-floor apartment. Dobson opened the door to her apartment with visible bruising on her face but would not speak to Corporal Dongbetor while Jacobs was present. After Corporal Dongbetor escorted Jacobs downstairs and returned to Dobson's apartment with additional officers, Dobson told the officers that Jacobs had punched her in her face and pushed her to the ground. Although Dobson complained of pain in her hip, she refused medical treatment at the scene. Footage from Corporal Dongbetor's body-worn camera captured his arrival at the scene and his initial interaction with Dobson.

(3) Dobson testified that she and Jacobs had been romantically involved on and off for fourteen years. Late in the evening of June 30, Dobson let Jacobs into her apartment. According to Dobson, after she made a comment about another man, Jacobs became enraged and began punching her in the face. As the parties wrestled, Dobson grabbed her phone and called her daughter Amber. Before Amber answered, Jacobs knocked the phone out of Dobson's hand and put her in a chokehold. As Dobson struggled for air, the parties' scuffle moved from Dobson's bedroom to the dining and living area of her apartment. At this point, a man knocked on Dobson's door and asked if she was alright. Dobson was able to unlock the door

2

and crack it open, even though Jacobs was trying keep her from doing so. The man shoved the door open, and Dobson ran into the hallway with Jacobs in pursuit. Dobson was eventually able to evade Jacobs, return to her apartment, and lock her door.

(4) Amber, Dobson's forty-year-old daughter, testified that she had a missed call from her mother in the late evening hours of June 30. When Amber called Dobson back and the call connected, she could hear what sounded like people tussling and her mother screaming that she couldn't breathe and begging Jacobs to "stop." Amber drove to her mother's apartment, arriving at the same time as the responding police officers. Amber FaceTimed her mother from outside the apartment building and observed bruising on her mother's face.

(5) Kevin Kelly, a Luxor Apartment Complex tenant, testified that he was awoken late in the evening of June 30 by loud noises that he soon realized were coming from a physical altercation in a neighboring apartment. After he banged on his neighbor's door, Dobson cracked open the door and Kelly could see that her face was swollen and that a man's arm was around her neck. Kelly pushed the door open, and Dobson and the man, who were loudly arguing, exited into the hallway. After Jacobs held Dobson up against the wall, Kelly shouted at Jacobs to release her. When Jacobs did not do so, Kelly kneed him in the ribs, enabling Dobson to escape. Kelly then pushed Jacobs up against the wall to keep Jacobs from pursuing Dobson.

3

Jacobs punched Kelly in the jaw, knocking Kelly unconscious. When Kelly came to a short time later, Jacobs was in front of the door to Dobson's apartment.

(6) Although Dobson refused medical treatment at the scene, she testified that she continued to experience pain in her neck and chest and went to an urgent care center on July 3. The pain persisted, and she went to the emergency room on July 10. Stephanie Neifert, a forensic nurse examiner who examined Dobson in the emergency room, testified that she had diagnosed Dobson with a fractured rib and a ruptured ear drum. Through Neifert, Dobson's medical records and pictures of Dobson's bruises were admitted into evidence.

(7) Jacobs testified in his defense. He told the jury that he and Dobson had recently rekindled their romance. When Jacobs was at Dobson's apartment on June 30, he "grabbed" Dobson's phone because he harbored suspicions that she was hiding something from him.[1] Dobson hit him, and he admitted that hit her back— once, with an open hand. Jacobs denied choking Dobson or throwing her to the ground. After Kelly knocked on Dobson's door and inquired as to her well-being, Dobson ran into the hallway. Jacobs followed Dobson, telling Kelly that he and Dobson could "handle [their] business," but Kelly pushed him.[2] The second time Kelly pushed Jacobs, Jacobs "turned around and deck[ed] him."[3] Jacobs then went

---

[1] App. to Opening Br. at A-261.
[2] Id. at A-264.
[3] Id. at A-265.

4

downstairs to let in Amber, who he knew was outside, where he encountered the police.

(8) The jury acquitted Jacobs of strangulation but found him guilty of second-degree unlawful imprisonment, malicious interference with emergency communications, offensive touching (Dobson), and offensive touching (Kelly). On July 18, 2025, the Superior Court sentenced Jacobs to an aggregate of one year and eight months of incarceration, suspended after thirty days for probation. This appeal followed.

(9) On appeal, counsel has filed a brief and a motion to withdraw under Rule 26(c). Counsel asserts that, after a complete and careful examination of the record, he could not identify any arguably appealable issues. Counsel informed Jacobs of the provisions of Rule 26(c) and provided him with a copy of the motion to withdraw and a draft of the accompanying brief. Counsel also informed Jacobs of his right to supplement his attorney's presentation. Jacobs has raised issues for the Court's consideration, which counsel attached to the Rule 26(c) brief. The State has responded to the Rule 26(c) brief and has moved to affirm the Superior Court's judgment.

(10) The standard and scope of review applicable to the consideration of a motion to withdraw and an accompanying brief under Rule 26(c) is twofold. First, the Court must be satisfied that defense counsel has made a conscientious

5

examination of the record and the law for claims that could be arguably raised on appeal.[4] Second, the Court must conduct its own review of the record and determine whether the appeal is so totally devoid of at least arguably appealable issues that it can be decided without an adversary presentation.[5]

(11) The arguments that Jacobs has submitted for the Court's consideration may be fairly summarized as follows: (i) the evidence was insufficient to support his conviction for malicious interference with emergency communications, and (ii) the Superior Court erred when it denied his request for a self-defense jury instruction. Jacobs also asks the Court to discharge him from probation. For the reasons that follow, we affirm Jacobs' convictions and sentence.

(12) We review the sufficiency of the evidence to support a conviction *de novo* to determine whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime beyond a reasonable doubt.[6] Our review is guided by "the fundamental tenet of American jurisprudence that the jury is the sole trier of fact responsible for determining witness credibility, resolving conflicts in testimony[,] and [] drawing any inferences from the proven facts."[7]

---

[4] *Penson v. Ohio*, 488 U.S. 75, 83 (1988); *McCoy v. Court of Appeals of Wis.*, 486 U.S. 429, 442 (1988); *Anders v. California*, 386 U.S. 738, 744 (1967).
[5] *Penson*, 488 U.S. at 81-82.
[6] *Maddrey v. State*, 975 A.2d 772, 774-75 (Del. 2009).
[7] *Id*. at 775 (citations omitted).

(13) Jacobs claims that the evidence was insufficient to sustain his conviction for malicious interference with emergency communications because Dobson and Amber both testified that she had tried to call the other, and Amber testified that she could hear Dobson and Jacobs arguing. Here, to obtain a conviction for malicious interference with emergency communications, the State had to show that Jacobs had "[i]ntentionally prevent[ed] or hinder[ed] the initiation, making[,] or completion of an emergency communication by another person."[8] An "emergency communication" is defined, in relevant part, as "any telephone call … [that] is intended by its maker to provide warning or information pertaining to any crime … or risk of injury … to any person …."[9]

(14) Dobson's testimony alone is sufficient to sustain Jacobs' conviction: she told the jury that after Jacobs punched her and "picked [her] up and slammed [her] on [the] head," she was trying to "figure out how [she] could get away from him and run out of the apartment."[10] When she concluded that "there was like no way to get out,"[11] she reached for her cell phone and placed a call to her daughter when Jacobs "knocked the phone out of [her] hand."[12] And Amber's testimony corroborated Dobson's account: Amber told the jury that when the call connected,

---

[8] 11 *Del. C.* § 1313(b)(1).
[9] *Id.* § 1313(a)(1).
[10] App. to Opening Br. at A-131.
[11] *Id.*
[12] *Id.* at A-132.

her mother did not speak to her but she could hear "like a bunch of … fumbling going on" and her mother "screaming" in the background.[13] In short, the State presented sufficient evidence upon which a rational jury could rely to find that Jacobs intentionally hindered the completion of a telephone call initiated by Dobson that was intended to provide Amber with information relating to a risk of injury to Dobson.

(15) Jacobs claims that he should not have been charged or penalized for his actions vis-à-vis Kelly because he was defending himself. We interpret this claim as an argument that the Superior Court erred when it denied his request for a self-defense jury instruction. The Superior Court denied Jacobs' request for the instruction, finding that Jacobs' testimony, taken as true, supported a finding that Jacobs' actions constituted retaliation, not self-defense.

(16) Section 464(a) of Title 11 "sets for the defense of justification or, as it is often colloquially called, 'self-defense.'" The statute provides that the "use of force upon or toward another person is justifiable when the defendant reasonably believes that such force is immediately necessary for the purpose of protecting the defendant against the unlawful force by the other person on the present occasion."[14] Under 11 *Del. C.* § 303(a), "[n]o defense defined by this Criminal Code or by another

---

[13] *Id.* at A-112.
[14] 11 *Del. C.* § 464(a).

8

statute may be considered by the jury unless the court is satisfied that some credible evidence supporting the defense has been presented."[15]  A defendant has presented evidence sufficient to satisfy the credible evidence threshold if the defendant's version of events, if taken as true, would entitle him to the instruction.[16]

(17)   The Superior Court correctly concluded that the evidence did not satisfy that standard here.  Taking Jacobs' version of events as true, Jacobs could not have reasonably believed that such force (in his words, he "decked" Kelly) was immediately necessary to protect himself against Kelly's unlawful force (in his words, Kelly "pushed" him).

(18)   Finally, to the extent Jacobs seeks relief from this Court related to his sentence, it is well-established that appellate review of sentences is extremely limited.[17]  Our review of a sentence generally ends upon a determination that the sentence falls within the statutory limits prescribed by the legislature.[18]  If the sentence falls within the statutory limits, we consider only whether it is based on factual predicates that are false, impermissible, or lack minimal reliability; judicial vindictiveness or bias; or a closed mind.[19]  Here, Jacobs' sentence falls within the

---

[15] *Id.* § 303(a).

[16] *Smith v. State*, 913 A.2d 1197, 1210 (Del. 2006).

[17] *Kurzmann v. State*, 903 A.2d 702, 714 (Del. 2006).

[18] *Id.*

[19] *Id.*

statutory limits and Jacobs does not contend—and the record does not reflect—that it was based on any improper predicates or was the product of judicial bias.

(19)   The Court has reviewed the record carefully and has concluded that Jacobs' appeal is wholly without merit and devoid of any arguably appealable issues. We are also satisfied that Jacobs' counsel has made a conscientious effort to examine the record and the law and has properly determined that Jacobs could not raise a meritorious claim in this appeal.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be AFFIRMED.  Counsel's motion to withdraw is moot.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

10